Commonwealth, Appellant, *v.* Zasloff.

Argued March 19, 1940. Before Schaffer, C. J., Maxey, Drew, Linn, Stern, Barnes and Patterson, JJ.

*William S. Rial,* Deputy Attorney General, and *Louis L. Kaufman,* Assistant District Attorney, with them *Andrew T. Park,* District Attorney, and *Claude T. Reno,* Attorney General, for appellant.

*Ben Paul Brasley,* of *Brasley, Rubin, Balter & Cole,* with him *Alexander I. Shaw* and *David D. Blumenstein,* for appellee.

OPINION BY MR. JUSTICE STERN, May 13, 1940:

This appeal from a judgment of the Superior Court (137 Pa. Superior Ct. 96) was allowed for the purpose of considering the constitutionality of the Fair Sales Act of July 1, 1937, P. L. 2672.

The act provides (section 2) that "the advertisement, offer for sale, or sale of any merchandise at less than cost by retailers or wholesalers is prohibited." A violation of this provision is made a misdemeanor (section 3). "Cost to the retailer" is defined (section 1a) to be "(1) the total consideration paid by the retailer for the merchandise delivered at the retail outlet; or (2) the total consideration necessary for the replacement of the merchandise to the retailer at the retail outlet, such consideration to be determined by applying to said merchandise the same cost per unit as the last quantity purchased by the retailer prior to the sale of said merchandise would have cost per unit if bought at the most favorable market price available to the retailer at any time within thirty (30) days prior to said sale, whichever is lower, less any customary trade discounts, but

exclusive of discounts for cash." There is a similar definition of "cost to the wholesaler" (section 1b). It is provided (section 1c) that " 'cost to the retailer' and 'cost to the wholesaler' must be bona fide costs; and sales to consumers, retailers, and wholesalers, at prices which cannot be justified by existing market conditions within this State, shall not be used as basis for computing costs with respect to sales by retailers and wholesalers." Certain types of sales are exempted (section 5), namely, bona fide clearance sales advertised as such; sales of perishable merchandise made in order to forestall loss; sales of merchandise which is imperfect, damaged, or being discontinued, and so advertised; sales of merchandise upon the final liquidation of any business; sales of merchandise for charitable purposes; sales by an officer under direction of a court; and sales "where the price of merchandise is made to meet the legal price of a competitor for merchandise of the same grade, quality, and quantity."

Statutes of this type have been enacted in about twenty of the States, most of them since the passage by Congress of the Act of June 19, 1936, ch. 592, 49 Stat. at L. 1526, 15 U. S. C. A. §§ 13, 13a, 13b, commonly known as the Robinson-Patman Act. Except in a very few instances, however, they differ from the Fair Sales Act of Pennsylvania in that, instead of a general prohibition of sales below cost, they forbid such transactions only when engaged in for the purpose of destroying competition, injuring competitors, deceiving or misleading customers, or creating a monopoly.

That the right of an owner of property to fix the price at which he will sell it is an inherent attribute of the property itself, and as such within the protection of the 14th Amendment, was referred to in *Old Dearborn Distributing Co. v. Seagram-Distillers Corporation,* 299 U. S. 183, 192, as a "well-settled general principle," in support of which many cases were there cited. However, no one in this day would attempt to maintain that

460

this right is sacrosanct and wholly immune, under any and all circumstances, from governmental regulation. The police power, originally conceived as applying to the health, morals and safety of the people, has been juridically extended to many fields of social and economic welfare. We have become familiar with statutes fixing rates in the case of industries affected with a public interest; neither is there any novelty in legislation aimed to control prices where the object is to prevent monopoly. But in these, as in all cases, the police power is not unrestricted; its exercise, like that of other governmental powers, is subject to constitutional limitations and judicial review, otherwise we would have an absolute instead of a constitutional scheme of government. It has frequently been stated by federal and state courts alike that a law which purports to be an exercise of the police power must not be arbitrary, unreasonable or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the object sought to be attained: *Mugler v. Kansas*, 123 U. S. 623, 661; *Chicago, Burlington & Quincy Railway Co. v. Drainage Commissioners*, 200 U. S. 561, 593; *Nebbia v. New York*, 291 U. S. 502, 525, 537, 539; *Mahon v. Pennsylvania Coal Co.*, 274 Pa. 489, 497; *White's Appeal*, 287 Pa. 259, 265; *Breinig v. Allegheny County*, 332 Pa. 474, 483. "The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations": *Lawton v. Steele*, 152 U. S. 133, 137; *Otis v. Parker*, 187 U. S. 606, 608; *Burns Baking Co. v. Bryan*, 264 U. S. 504, 513. While it is for the legislative branch of government to enact such measures as it deems desirable for the advancement of the public welfare, the judiciary is the ultimate authority to determine whether constitutional restraints have been violated, confining itself, of course, to the question, not of legislative policy, but of legislative power: *Mugler*

*v. Kansas,* 123 U. S. 623, 661; *Lawton v. Steele,* 152 U. S. 133, 137; *Burns Baking Co. v. Bryan,* 264 U. S. 504, 513; *Weaver v. Palmer Bros. Co.,* 270 U. S. 402, 410; *Commonwealth v. Vrooman,* 164 Pa. 306, 316; *White's Appeal,* 287 Pa. 259, 264, 265; *Harris v. State Board of Optometrical Examiners,* 287 Pa. 531, 536; *Breinig v. Allegheny County,* 332 Pa. 474, 483.

The present inquiry, therefore, is to determine whether the provisions of the Fair Sales Act are so arbitrary and unreasonable, so obviously unnecessary in their severity and comprehensiveness for the accomplishment of the object to be attained, as to amount to an unjustified interference with private business and property, and for that reason violate the due process clause of the 14th Amendment as well as Article I, section 1, of the Declaration of Rights of the State Constitution, which declares that the acquiring, possessing and protecting of property are inherent and indefeasible rights. If the Act confined itself to prohibiting sales below cost when intended to destroy competition, it would undoubtedly be valid, as has been held in various jurisdictions where such acts have been enacted with that qualification: *State v. Central Lumber Co.,* 24 S. D. 136, 123 N. W. 504 (affirmed 226 U. S. 157); *People v. Kahn,* 19 Cal. App. (2d) 758, 60 P. (2d) 596; *Wholesale Tobacco Co. Dealers Bureau v. National Candy & Tobacco Co.,* 11 Cal. (2d) 634, 82 P. (2d) 3; *State v. Langley,* 53 Wyo. 332, 84 P. (2d) 767; *Associated Merchants v. Ormesher,* 107 Mont. 530, 86 P. (2d) 1031; *Rust v. Griggs,* 172 Tenn. 565, 113 S. W. (2d) 733; *Hammond v. Bayless Markets, Inc.,* (Ariz. Superior Ct.), Prentice-Hall Fed. Trade & Ind. Serv. (2d ed.) 96,532. The opinions of the courts in those cases emphasized the fact that the statutes there under consideration made criminal only such sales as were designed for the suppression of competition or other predatory purposes, and the means employed by those statutes were therefore reasonably related to their objective. In New Jersey, on the other

hand, where, as in Pennsylvania, this qualification was not in the act, the statute was declared unconstitutional: *State v. Packard-Bamberger & Co.,* 123 N. J. L. 180, 8 A. (2d) 291. Price cutting in itself is not an evil; on the contrary, the more intense the competition the greater the likely advantage to the purchasing public. Indeed there is no reason why a merchant should not make an absolute gift of merchandise to his customers if he desires to be benevolent or thereby to advertise his business. There are many other conceivable and wholly proper reasons which might induce him to make sales without profit, as, for example, a necessity of paying importunate creditors. It is only when the object of price cutting is sinister,—to destroy a competitor by suffering a temporary loss in order to gain an ultimate monopoly *(Mogul Steamship Co., Ltd., v. McGregor, Gow & Co.,* 23 Q. B., L. R. 598), or to defraud the public by seducing them into the purchase of other goods at an exorbitant price—that the selling of goods at less than cost may constitute an economic or social evil. The Pennsylvania act, therefore, is arbitrary, and the means which it employs are grossly out of proportion to the object which it seeks to attain.

There are certain businesses which at one time or another have been regarded by the community as so inherently and generally vicious that the courts have recognized the power of the legislature to suppress them altogether; for example, the manufacture and sale of intoxicating liquors *(Mugler v. Kansas,* 123 U. S. 623), the manufacture of oleomargarine *(Powell v. Pennsylvania,* 127 U. S. 678), the sale of futures in grain or of stocks on margin *(Booth v. Illinois,* 184 U. S. 425; *Otis v. Parker,* 187 U. S. 606), and several other types of business referred to in *Nebbia v. New York,* 291 U. S. 502, 528, note 26; see also *Carolene Products Co. v. Harter,* 329 Pa. 49, 53-56. But the selling of merchandise below cost is, in general, an innocent and legiti-

mate practice, and subject to abuse only in occasional instances. Under such circumstances it has been uniformly held to be beyond the power of the legislature to effect an absolute prohibition. Thus in *Adams v. Tanner*, 244 U. S. 590, a law was declared to be unconstitutional which forbade employment agents from receiving fees from the workers for whom they found places, the court saying there was nothing inherently immoral or dangerous to public welfare in the business of such agents, and that, because abuse might and probably did occur in connection with this business, there was adequate reason for hedging it about with proper regulations but not for the wholly prohibitive provision contained in the act. In *Weaver v. Palmer Bros. Co.*, 270 U. S. 402, an act of our own State, which forbade the use of shoddy in comfortables, was declared violative of the due process clause of the 14th Amendment because shoddy could be rendered harmless by sterilization, and adequate regulation would have been sufficient to remedy the evil sought to be corrected. In *Tyson & Brother v. Banton*, 273 U. S. 418, 442, 443, for similar reasons, an act was held invalid which forbade the resale of theatre tickets at a price in excess of fifty cents in advance of the price printed on the face of the ticket. Closest of all to the present case, and practically determinative of it, is *Fairmont Creamery Co. v. Minnesota*, 274 U. S. 1, where it was held that a state law which made it an offense for anyone engaged in the business of buying milk, cream, or butter fat, for manufacture or sale, to pay a higher price therefor in some localities of the state than in others was an unconstitutional infringement of liberty of contract. The court there said (p. 9) : "The real question comes to this— May the State, in order to prevent some strong buyers of cream from doing things which may tend to monopoly, inhibit plaintiff in error from carrying on its business in the usual way heretofore regarded as both moral and

beneficial to the public and not shown now to be accompanied by evil results as ordinary incidents? Former decisions here require a negative answer. We think the inhibition of the statute has no reasonable relation to the anticipated evil—high bidding by some with purpose to monopolize or destroy competition. Looking through form to substance, it clearly and unmistakably infringes private rights whose exercise does not ordinarily produce evil consequences, but the reverse."

The Commonwealth seeks to minimize the objectionable generality of the act by stressing the instances excepted from its provisions, as, for example, sales in liquidation, and sales of damaged and perishable merchandise. But these are minor in nature and leave practically untouched the sweeping prohibition of profitless sales made in the ordinary course of business and without any intent which is malicious or inimical to the public welfare.

It is unnecessary to consider other objections that might be urged against the constitutionality of the act. It may, however, be briefly pointed out, as to one of these, that, in creating an offense which was not a crime at common law, a penal statute must lay down a reasonably ascertainable standard of guilt; it must be sufficiently explicit to enable a citizen to ascertain with a fair degree of precision what acts it intends to prohibit, and therefore what conduct on his part will render him liable to its penalties,—in the present case, to make it possible for a vendor to know whether a proposed sale at a given price would violate the provisions of the act. It would be within the knowledge of a merchant to know what his merchandise cost him, but if he wished to avail himself of the other standard of cost prescribed in the statute, namely, what the last quantity purchased by him would have cost if bought at the most favorable market price available to him at any time within the preceding thirty days, how could such cost be ascer-

tained without his exhausting every possible source of inquiry to find out what the most favorable market price was that would have been available to him within the time specified? And even if such price could, from a practical standpoint, be discovered, who could reasonably determine whether, as stipulated by the act, the price thus used as a basis for computing cost would be "justified by existing market conditions within this State"? And how could a merchant know whether a selling price which he proposed to fix was legal because it met "the legal price of a competitor for merchandise of the same grade, quantity and quality"? How could such "legal price of a competitor" be ascertained without examining the competitor's books in order to determine whether *his* price was legal? The standard set by the act to differentiate criminal from legitimate sales is so vague, indefinite and incapable of practical application that this in itself would make its enforcement a violation of the due process clause: *International Harvester Co. v. Kentucky*, 234 U. S. 216; *Connally v. General Construction Co.*, 269 U. S. 385; *Champlin Refining Co. v. Corporation Commission of Oklahoma*, 286 U. S. 210, 243; *Lanzetta v. New Jersey*, 306 U. S. 451; *State v. Ruback*, 135 Nebr. 335, 281 N. W. 607.

For the reasons stated, we find the Pennsylvania Fair Sales Act to be a violation both of the 14th Amendment of the Federal Constitution and of Article I, section 1, of the Declaration of Rights of the State Constitution. This was the conclusion reached by the Quarter Sessions Court of Allegheny County, which quashed the indictment against defendant for alleged violations of the act, and also by the Superior Court.

The judgment of the Superior Court, affirming the order of the Court of Quarter Sessions of Allegheny County, is affirmed.